I'm Jennifer Padilla, with me is Emily Skinner. We're appearing on behalf of ABLE. Take the lectern and begin. I take it you received the order filed on late Friday. We did, thank you. I just want to make sure the Council was prepared. Go right ahead. I'd like to reserve five minutes for rebuttal. I doubt you'll have it, but whatever's left on the clock will be yours. Thank you, Judge. If I may, I'd like to begin with some things we know now about Mr. Dietrich. We know that his brain was damaged by both his genetics and his environment. He was born with a biologically defective brain. He has neurological disabilities resulting from his mother's in utero alcohol consumption, and he has a genetic propensity to substance addiction. Then his brain was assaulted by the constant violence and chaos throughout his childhood. Through the ages of four through nine, he developed post-traumatic stress disorder as a result of the horrific physical and emotional abuse he suffered. He began drinking alcohol at age nine in order to cope. As an adolescent, he continued to be surrounded by horrors. For example, he witnessed his stepfather beat his mother so severely he thought his stepfather would kill her. Cumulatively, these experiences had a devastating effect mentally and emotionally. His brain dysfunction affects every significant manner of his functioning, cognitive, behavioral, and social. The sentencer knew very little of this because Mr. Dietrich's sentencing counsel was ineffective and failed to present it. Post-conviction court did not know most of this because it refused to allow any investigation or fact development to support these claims. But this court can now consider the truth. There are no barriers to this court's consideration of this evidence. And that's because the state court evidence satisfies 2254D in several ways. And if I may, I'd like to outline the four of them. You'll do this with a filter of pinholster, which speaks to this very issue. It certainly does. Pinholster does not bar this court from considering evidence that was developed in a federal evidentiary hearing because the state court evidence satisfies 2254D in four ways. One of which is that it satisfies 2254D too because the state court fact-finding process was defective, where the state court refused to grant any investigative funding for this Strickland claim, which necessarily required fact development. Let me ask you this. I've been thinking a little bit about this. There's no right to counsel on state habeas, right? I'm sorry. There's no right to have the state pay for counsel. Well, there is a right in Arizona. But there's no constitutional right. There's no federal constitutional right. That's correct. There's an equitable right under Martinez. Well, we can talk about that. But if there's no federal constitutional right even to a lawyer, where does your client get a constitutional right to an investigator supported by the state? How can you call the failure to provide money for an investigator to be a defect? Well, it's a federal due process right because once the state has chosen, as it has in Arizona, to allow procedures by which a defendant may prove a Strickland claim of ineffective assistance of counsel, it's required to comport with basic due process. And the court refused to do that. And that includes funding an investigator? The state is required to sort of pay money out of its own coffers in order to have people out there searching for evidence to impugn its criminal judgments? It does in this case because in this case the Strickland claim necessarily required fact development. The Strickland claim, which we're discussing today, is one of counsel's ineffectiveness for failure to present information at sentencing that was mitigating, that would have mitigated. Do you have a Supreme Court case to support this? We have basic due process cases. Is there an easier way to get where you want to get on this? That is to say the state is not constitutionally required to provide during state hearings either counsel or investigative funds, but that E2254E2 says that it refers to the failure of the habeas petitioner to present evidence. And we know from the Williams case that cited both by the majority in Penn-Holster and by Justice Alito concurring in Penn-Holster that failure means fault. So if through no fault of his own Mr. Dietrich was prevented from developing his record in state court, as I read it, the state isn't required to allow him to do it. But if the state doesn't allow him to develop it, it's taking its chances because it's leaving the door open for that evidence to come in on federal habeas. We totally agree with that, and that was our argument under E2254D2, If you agree with that, you'd be mistaken, wouldn't you? Because the state will say, look, you can go out and do all the investigating you want, get all your friends to do it, find a pro bono lawyer, find a philanthropist. We're not standing in the way. You can investigate to your heart's content. What you can't do is get money for it. Well, what if the state has denied the investigation on a constitutionally impermissible ground? Because what the state judge did here was to deny the investigator, citing Stokely, saying that the evidence that you're trying to get of childhood trauma is not admissible in Arizona for purposes of mitigation. That is a flat-out Eddings error. So the state court made a constitutional error as the basis for denying that investigator. It did, and it was spurred on to do that by respondents who opposed fact development and opposed evidentiary development, opposed the request for evidentiary hearing in state court. And as you mentioned, if we're looking at whether or not it's the fault of the petitioner, it clearly was not the fault of the petitioner here to fail to present those facts in state court because he was opposed by both the state court and respondents in doing so. And the only reason the state trial court gave for refusing to authorize the investigator was not that we don't give money. It was rather that this evidence is irrelevant, and the state court's conclusion as to why that evidence was irrelevant is constitutionally wrong under Eddings. Yes, we totally agree with that. The court said that further evidence of Mr. Dietrich's childhood abuse would have been merely cumulative, but the court was ignorant of what that evidence would be because it had itself prevented this fact development. And as counsel pointed out in the motion... Again, as a hypothetical, as a law school exam question, but don't we need a Supreme Court case directly on point? Has the Supreme Court again said again, time and again, that if we want to impugn the state court's findings under AEDPA, we have to actually find a Supreme Court case directly on point? And I don't remember such a case. One case that we do have that supports the position here is Martinez v. Ryan, where the U.S. Supreme Court said, effective assistance of counsel is a bedrock right. It's the foundation of our justice system. And in Arizona, the court recognized in Martinez, in Arizona, a meaningful postconviction is essential to protect that right because in Arizona, postconviction is not just the first available opportunity to present a Strickland claim. It is the only, the one and only opportunity to present a Strickland claim. And the court also recognized that Strickland claims often depend on evidence outside the trial record. Who paid for Dr. Briggs and his report? The state court did pay for that. And that was after the defendant had asked no fewer than eight times in postconviction for support for his claims. He asked for an investigator. He asked for a hearing on the need for that funding for the investigator. And he asked for the substantive hearing on the colorable claim of ineffective assistance of counsel. And counsel explained this very specific need for fact development. He explained there's new mitigation that exists that we've discovered through our telephone calls. More mitigation is certain to be found, but we don't know what that is until we do the investigation. And here's what the investigation would do. The investigator would travel out of state, would collect records, would collect declarations, would interview witnesses, and all of that would be provided to support the neuropsychologist who is required to do this testing. And the court went ahead and provided the funding for the neuropsychologist to do the testing, but not for the factual support behind the report. And there was an appeal to the Arizona Supreme Court and the fail to fund the investigation, right? That's correct. And Mr. Dietrich took a special action to the Arizona Supreme Court, and that special action was denied without comment. So the state court denied all these requests, summarily dismissed the petition in an order that was drafted by respondents with the stated goal to avoid federal review. The respondents said, our specific goal is to insulate the findings from federal review. And under Hurls v. Ryan, Taylor v. Maddox, and Nunez v. Mueller, the law of this court, that satisfies D2 because the state court fact-finding process is defective. The defect, again, is the failure to fund the investigation. There isn't anything else. The defect is the failure to fund the investigation and provide a hearing on the need for that investigation and to provide a hearing on this substantive and colorable claim of ineffective assistance of counsel. The court did not provide any of those, despite counsel's repeated requests. I'm not understanding the last item. This is ineffective assistance of trial counsel in failure to find this evidence himself? Ineffective assistance of counsel at sentencing for counsel's utter failure to even attempt to obtain this evidence, which was readily available, and for which he was on notice through the documents that were introduced at the trial court. What do we do with the Martinez motion in light of the current posture of this case? Yes, well, there are a few things this court could do. What we are requesting this court to do is to both grant relief on this substantive claim of ineffective assistance of counsel for counsel's failure to develop and present mitigation, and also to remand for further evidentiary development in the district court on the Martinez issues, and there's precedent for that. This court has done so in Williams v. Ryan. That's Aaron Williams v. Ryan, where this court ordered a resentencing on a causal connection issue, but additionally remanded for an evidentiary hearing on a Brady claim related to a trial issue. Mr. Barron raised many of the same claims you're arguing that were not raised. He raised that at the post-conviction level, did he not? He did in the post-conviction petition.  Well, there were three, I guess, that he didn't pursue. One was the, I guess what you are asserting on behalf of your client, that he failed to meaningfully investigate Charlton, failed to investigate and interview the witnesses, the Bells, and that trial counsel undermined own misidentification theory. I guess I'm just trying to figure out how significant those are and what we're supposed to do in light of Martinez. Don't we need to find out or make an assessment whether they're substantial or do we send that back to the district court to do that? Yes. A petitioner in a Martinez motion must demonstrate that post-conviction counsel was ineffective under the standard of Strickland and that the underlying claim is substantial, but that is a low standard. The Ninth Circuit has not required a petitioner to prove post-conviction counsel's ineffectiveness completely or the merits of the underlining claim completely to be entitled to remand. Instead, a petitioner must show that Martinez may provide a path for the petitioner to establish cause for procedural default. That's from this court's opinions in Dickens. And here we believe we have showing that Martinez may provide a path for the petitioner to establish cause. How so? By the claims that you mentioned, and there's an additional claim of counsel's failure to conduct independent forensic testing, that counsel did not obtain a pathologist, counsel did not conduct forensic testing on items from trial, such as the hairs found on the victim's hand. But I thought Mr. at least in my review, I thought Mr. Barron raised those on post-conviction stage. Post-conviction counsel, Barron, raised them at some point, but the district court found these to be defaulted because they were abandoned at some point or never raised at all in the post-conviction. So the district court rejected the argument that we made in the district court that post-conviction counsel's ineffectiveness could serve as cause, because at that time, of course, there was no Martinez case, and at that time there was no cause for post-conviction counsel's failure to raise claims thoroughly or correctly. But you agree that you have to show substantial claims, right, that these claims are substantial. For instance, you raise the claim that trial counsel failed to interview and investigate witnesses to contradict Charlton in the murder car and Carbonell as the receiver of the confession, and you cite the declarations of Donald and Darcy Bell. They're not in the record. And how are we to know, how are we to determine that's a substantial claim if you don't tell us what Donald and Darcy Bell said? We apologize, Your Honor. We believe those were in the record. I don't have that citation with me now, and if they are not, then we most certainly will supplement immediately upon following of oral argument. And if Baran or Baran did raise that issue, then he wasn't in effective assistance of counsel as to that issue under Martinez, and you are procedurally defaulted, correct? That is correct. But the district court found this. Now, that's also so true regarding the failure to investigate Alan Charlton. The issue is made about Charlton's racism. But you also point out that Shell's testimony was not made available for trial, live testimony, but it was read into trial, read into a trial. And Shell testifies very at length about the racism of Charlton. So that's not a substantial claim, is it? We believe it was because the jury did not have an opportunity to look Shell in the eye to see. Well, they did the first time, and they didn't believe him in the trial, right? So now they're looking at him the second time they're going to believe him? He was pretty effectively cross-examined as to his criminal record. Well, the first time Mr. Shell testified, he was in prison clothes and wearing handcuffs because he was incarcerated for an offense that's not relevant to Mr. Dietrich's claim. So at this point, we believe that Mr. Shell would be a more credible witness, not appearing to the jury. And you agree that as to all the claims that you make now, as far as the ineffective assistance of counsel in post-conviction relief, if they were raised by Beran, then you are procedurally default? If they were raised thoroughly and fully, and the district court did not determine that they could not be considered because of counsel's ineffectiveness. But the district court here rejected the argument that post-conviction counsel's ineffectiveness could serve as cause. That's right. But we have to re-examine that under Martinez. But the basic problem is, under Martinez, it sounds as though Beran, or however pronounced the name, the state habeas counsel procedurally defaulted a whole series of arguments or claims for ineffective assistance of trial counsel. The district judge, I think quite correctly under the laws that then stood, said, well, those are procedurally defaulted because the ineffective assistance of state habeas counsel doesn't count. So what we've got to do is figure out, okay, how important might those claims have been? Were they substantial? It seems to me one of them that we've been dancing around for a while, and we've both mentioned it, both you and Judge Bea have mentioned it, the fact that Shell, the first time around, testifies while in prison guard and in handcuffs. Was he acquitted of the crime for which he was then incarcerated? He was. So this time around he comes not only under the shadow of a criminal conviction, he now comes not in prison clothes and so on. So he will be a very different witness this time around. And I gather what happened with trial counsel for the second trial is he talked to him on the phone but then really made no real effort to get in there in time. I mean, Shell said he was going to come, but trial counsel wanted him there on the airplane instead of coming on the train. He contacted him only two weeks before. I mean, his star witness stays in Missouri. I mean, I don't get it. Yes, those are the facts. That is correct. And remember, post-conviction counsel was raising these claims under extreme evidentiary development restrictions by the court. The court had refused an investigator to find the facts. When we know in Arizona that's the whole purpose of a post-conviction is to discover the facts that perhaps were not presented at trial or sentencing. So post-conviction counsel was really in a quandary and presented as many of the claims as were available to him, but he did explain that his evidentiary restrictions had prevented him from raising all of the available claims and from fully supporting all of his claims. He explained in his motion for an investigator that the examples of the things that the investigator were to do were not inclusive. He said an investigator must begin an investigation before the results of an investigation may be known. That's in ER 128, which also lays out some of the procedural history for some of these requests. So to the extent that the evidence is lacking for the claims that we've raised in the Martinez motion, that's due to the state court's restrictions in state court. Let's focus on the failure to bring the witness from Missouri to testify in person. Why couldn't he have raised that? Well, we believe that counsel did raise that in the Rule 32 but abandoned it in the petition for review, which would be ineffective because it was a legitimate claim. It had constitutional support. It could have entitled Mr. Dietrich to relief, and counsel in post-conviction apparently abandoned that claim halfway through the proceedings. So we believe that that is a claim which would entitle Mr. Dietrich to relief. Because we're second-guessing now that he should have pursued it? Why can't counsel look at a claim and say, look, this is just not going to be a winner? You know, the witness did testify, maybe not in the ideal conditions, but does he have to raise the claim if he sees it as not ineffective or as not being a constitutional error? Well, there's no evidence in the record that counsel actually did believe that, which is why we need to go back for evidentiary development on the Martinez claim. Counsel, you started out by saying that you had four grounds on which the – okay, are you going to get to the other three? Yes, certainly, if I may outline them. Number one was the fact-finding process was defective under D-2, as we've mentioned, for the state court's restrictions. But the state court decision was also based on an unreasonable determination of the facts under 2254 D-2 because the state court ignored critical evidence in Mr. Dietrich's impaired neuropsychological functioning. Further, the state court decision was objectively unreasonable under 2254 D-1 because the fact-finding processes in state court were defective, or rather not adequate for reaching reasonably correct results under Panetti. And the court failed to show it properly considered and weigh the totality of the evidence. What did the state court fail to appreciate regarding the wrongfulness of the conduct or the inability of Mr. Dietrich to conform to the requirements of law? This is the claim under D-2 that the state court ignored critical evidence of neuropsychological functioning. Certainly I'd be happy to get to that. This is the primary grounds that the panel rested its decision on in the earlier case of Dietrich v. Schirro. The state court unreasonably determines the facts under 2254 D-2 when it overlooks or ignores evidence that's highly probative and central to a claim or plainly misapprehends a record regarding a material or factual issue. And here, when dismissing Mr. Dietrich's Strickland claim, the state court unreasonably determined the facts when finding that, first, additional evidence of Mr. Dietrich's dysfunctional childhood would have been merely cumulative. It overlooked the critical record evidence that the court itself had prevented the development of this evidence, so it couldn't possibly know if this evidence would be cumulative. And number two, when finding that Mr. Dietrich's overall neuropsychological functioning was normal and that the post-conviction neuropsychological report was not different at sentencing, it overlooked or misapprehended critical record evidence that Mr. Dietrich had brain damage and that that brain damage had a causal connection to the crime and that that evidence was not presented at sentencing. At sentencing, the court had a psychological report and a psychiatric report indicating that Mr. Dietrich had no major mental disorder or significant psychiatric disturbance. And this misled the sentencer to correctly conclude that Mr. Dietrich suffered no neuropsychological impairment. Well, Dr. Briggs also found that. Dr. Briggs also found him normal even though this was a recovered picture, right? Well, he found his overall test scores to be in the normal range. There were some deficiencies in the testing results. His IQ was above average. Overall in the normal range is what he found, but he said that he was barely in the normal range, one point shy of normal, and this was in a recovered state 11 years since the crime in absence of the kinds of injuries that would have made his impairment greater at the time of the crime. So any dating of any of the injuries to which Dr. Briggs referred mentioned head injuries twice. He didn't give us any date of the head injuries, and he didn't give us any onset of the recovered state as opposed to the unrecovered state. Is that correct? That's correct. It was not specified in the report, but there were numerous head traumas. It was mentioned. Right. There was no dating at all as to the cause of the head injuries, whether they occurred back when he was a kid under a motorcycle or whether it occurred after his conviction while he was in the prison, right? That's correct, and that's why counsel requested a hearing, an evidentiary hearing on the findings of Dr. Briggs in his report, and the state court denied those requests repeatedly. Counsel explained that he needed further development of the facts that were or the findings and the conclusions of the report, and the state court instead decided that it had all the information that it needed. It found that Mr. Dietrich's overall neuropsychological functioning was normal and that the report was not different from what was presented at sentencing, but that overlooked the facts that Dr. Briggs did find the overall scores were in the normal range, but those results in isolation do not represent Dr. Briggs' medical opinion. There wasn't that much difference between what Dr. Briggs had to say and what the 1985 psychological report, 1985 psychiatric report, and 1991 psychiatric report had to say, that there was not that much difference. That is the finding to which we owe deference under AEDPA, correct? This court owes deference under AEDPA until 2254D is satisfied, and we've shown through our briefing that the state court decision was an unreasonable determination under 2254D too because the fact-finding process was effective. Not that the state court fact-finding was erroneous. That's not enough under Taylor v. Williams. We have to find this unreasonable, which means that there's no reason which supports it, correct? Well, that's correct, but also under Hurls v. Ryan, this court can find that 2254D is satisfied when the fact-finding process is deficient, and also the district court case of Williams v. Woodford. It has to be unreasonable, not deficient. It has to be either overcome under E, or it has to be defective, or it was no decision made. There are the three in Taylor v. Williams, Williams v. Taylor. There are those three situations where it's available, correct? Well, what is correct is that the findings clearly result in an unreasonable determination of the fact. Unreasonable, not erroneous, but unreasonable. That's correct, unreasonable determination of the facts under D2, and that is found when the state court fact-finding process is deficient, such as the case of Williams v. Woodford, where under Taylor and under Hurls, the district court found that where the state court makes evidentiary findings without holding a hearing, without an opportunity to present evidence, those findings result in an unreasonable determination of the facts under 2254D2. You have less than 40 minutes, if you really want to save your time. I do, Your Honor. I'd like to reserve the remainder of time for rebuttal. Okay, thank you. We'll hear from State. Chief Judge Kaczynski, and may it please the Court, Kent Patani, representing the State. I'm here with Laura Chason, and I apologize, I did not see an order on Friday, so I'm not aware of that. I hope I can answer any questions that may come up. You're not on CME-CF? You don't get our orders electronically? I'm not sure what time it went out. I usually do get orders, but I apologize for whatever reason. I was in the office. Pardon me? I was still in the office. I was preparing for the argument. In any event, I'd like to start by talking about the denial of funding. It's important to put this in context. This was not a denial of funding regarding mental health evidence. The context was they wanted more investigation regarding his childhood and background, and more investigation of mental health evidence. He was given funding for Dr. Briggs. The childhood evidence that we're talking about now is cumulative, even to this day, even with the new information developed in federal court. It's essentially cumulative, and there's a reason for that. As I read the trial court's justification for refusing to provide funding for that, it was not so much that it was cumulative. The trial judge cited the Arizona Supreme Court's decision in Stokely, and what the court in Stokely wrote was, well, childhood mitigation evidence isn't proper mitigation evidence unless it can be connected to the crime itself or the state of mind at the time of the crime. Now, if that's the reason or the basis on which the trial court is citing the Arizona Supreme Court's decision in Stokely, it's citing an erroneous provision in Stokely that we have repeatedly since that time said, you know, that's just a violation of the Supreme Court's decision in Eddings. Am I misreading what the state trial court did? Because it cited Stokely as a basis for refusing the funding. I think it's important to keep in mind that the trial court found childhood difficulties as a mitigating circumstance in this case. So this very judge, Judge Nichols... Childhood difficulties can be a mitigating circumstance under Arizona law as it then existed, provided that they are connected to the state of mind at the time of the crime. But the reason I gather, and I'm just looking at the order of the state trial judge, that he's refusing to allow further investigation is he cites Stokely. And Stokely says, well, they're not mitigating if you can't connect them up. Well, that's an improper statement of the law. First, I disagree that the Arizona courts have ever held that the evidence will not be considered. The Arizona courts have simply said that it goes to the weight that will be given the evidence. I beg to disagree, and we've reversed the Arizona Supreme Court several times on precisely that point. But I guess what's even more significant, it seems to me, in this case, is this very judge at the second sentencing considered the evidence and found it to be mitigating. So he did not impose a causal nexus test before finding that Mr. Dietrich's childhood was in fact a mitigating circumstance. And it's important to keep in mind here, this is someone with an above average, high average IQ, who was completely familiar with his own childhood and background. He had cooperated in Kansas with the pre-sentence reports that were prepared that detailed his childhood difficulties. You had a very thorough report from Kansas, and then another very thorough report with Dr. Boyer prior to sentencing. So the best source of this type of information is presumably the client himself, particularly where there is no neurological damage. You had cooperation from his family members, from his mother and from his sister. And there wasn't a denial of funding to the attorney. The attorney could do more investigation, certainly can talk to people about his childhood. So I would disagree that this in any way has limited his ability to present this claim. And I think that's borne out by what ultimately came out in the federal habeas proceeding. There simply is nothing that's significantly different about his difficult childhood experiences. That was known to the court, and the court in fact found it to be mitigating. Without imposing any causal nexus requirement, Judge Nichols found that it was a mitigating circumstance. How much of the evidence as to what had happened during his childhood that comes out in federal habeas, and how much of the evaluation of that evidence in your view is new? Any? There's very little that's new. At the time of sentencing and certainly by the time of the state. In other words, you simply disagree with the three-judge panel even before it goes up pre-Penholster. I agree with Judge McEwen on that point, that it was essentially cumulative. But do you agree, do you totally disagree with the panel the first time around then? Yes, I do. You think all three of them were wrong? Yes, I agree with Judge McEwen that it was essentially cumulative. The details were there regarding his childhood. You disagree with Judge McEwen the second time around. You disagree with her the first time around, I gather. That's right. And when you say there's very little that's different, are you looking at Dr. Boyer's report for putting in some of that detail? If we're not talking about the mental health, I was initially just talking about the childhood differences. And even the panel the second time didn't really focus on differences in the childhood experiences. So with regard to the mental health evidence, I think Dr. Briggs' report is very similar to that from Dr. Boyer. Dr. Boyer also went through his childhood traumas, I think, if I'm remembering correctly. He talks about the abuse and efforts to drown him and various other things that come out later, I think. Dr. Boyer specifically references, as Dr. Catherine Boyer specifically references, his childhood experiences and had reviewed the information, certainly from Kansas. So that information was known to Dr. Boyer, and more significantly, since our review here is focused on what was before the post-conviction court, that was certainly information that was known to the trial court, to Dr. Briggs, and was considered. Well, you know, what was known to Dr. Briggs and what wasn't known to Dr. Briggs, Dr. Briggs the second time around, with additional information, changes his diagnosis. I'm not sure that he changes his diagnosis. I think he says that he would have liked to have had some more information. Well, as I read his second report, the report not the one presented to the state trial court, but presented to the federal trial court on habeas, that's a very different report from Dr. Briggs' second time around. He says, well, now that I know all this other stuff, I'll give a much more adverse or much more severe diagnosis as to his state of mind at the time of the crime. But I don't think that changes the testing that Dr. Briggs did, the neurological evaluation, where he found, for example, that he had a... I don't think we're in a position to tell Dr. Briggs what his evaluation of his testing ought to be when Dr. Briggs has already told us what it is. He says second time around, okay, I did these tests, but had I known then what I now know about his background, I would have evaluated those tests very differently. I'm just not sure there's any way to reevaluate the fact that someone has a high average IQ. Well, I'm not sure you and I are in a very good position to say what a psychiatrist or trained psychologist should do. I mean, he has told us, now that I know that additional information, here's my diagnosis. And you're saying he's wrong the second time around? Well, what I'm suggesting is if the inquiry here depends on what was before the state trial court in the postconviction proceeding, I think that diagnosis that Dr. Briggs provided was not significantly different than what the state habeas court, the state postconviction court, was aware of, I think is the focus of our inquiry here. And if it was not, then it was not unreasonable for the trial court to conclude that having a neuropsychologist like Dr. Briggs testify would have changed the sentencing determination. We're not in a situation where we're having to guess whether Dr. Briggs' report as presented to the state court in the postconviction proceeding would have made a difference. The very judge who sentenced Dietrich conducted the postconviction proceeding. He looked at Dr. Briggs' report and concluded this would not have changed my mind. So we're not here guessing about what a jury would or would not have done with this information. The very judge who sentenced him said this would not have changed my mind. And we know from the United States Supreme Court in the Landrigan decision that a trial judge who presides over the sentencing and then conducts the postconviction proceeding is uniquely qualified to make that type of assessment. But counsel, didn't the state judge here deny an evidentiary hearing to get further information about the significance of Dr. Briggs' findings? Well, he denied an evidentiary hearing because he found that the claim was not colorable. And in that way, this case mirrors pinholster. In pinholster, there was no evidentiary hearing. It was just a finding that the claim is not colorable. And we look at a claim based on a report from a neuropsychiatrist who says he has no neurological damage. He's within the normal range. And so there's not a colorable claim. The trial court was well within its discretion to not hold an evidentiary hearing and find that he had not established a colorable claim. And the question before this court is, could any reasonable fact finder reach that conclusion based on reading Dr. Briggs' report? And I submit that the answer is yes, as Judge McEwen has concluded, as the district court concluded, certainly as the trial court and the Arizona Supreme Court concluded. But Dr. Briggs' report did not, was not so compelling that it would create a need for a new sentencing hearing. The very judge who sentenced Dietrich said, this would not have changed my mind. And I think accepting the panel's decision in this case. He says, what's in front of me wouldn't have changed my mind. But he's not in a very good position to say, well, what's not in front of me and I don't yet know wouldn't change my mind. That's right. But you have to have a colorable claim. We don't have to have a hearing. We know that from pinholster. We know that from Richter. Well, you know, there might have been a colorable claim if he'd allowed some factual investigation. That factual investigation then would have produced a different report from Dr. Briggs, as we now know. Except that he did allow investigation. He allowed funding for Dr. Briggs. But that's not an investigation. That's testing. What changed Dr. Briggs' mind was the additional information about the childhood that comes to mind that is then brought to Dr. Briggs' attention. Well, I don't think that's very credible, given that the additional information relating to the childhood is not significantly different from what was already before the court. In other words, you're saying Dr. Briggs was wrong in his second report? I certainly disagree that there's significantly different information relating to the childhood than was already before the trial court, certainly as of the date of the post-conviction proceeding. Well, so, for example, counsel, what information was there when Dr. Briggs issued his first report about the extent to which Mr. Dietrich's mother ingested alcohol during her pregnancy? I think that was the new information. We have to go to the... Right. And so I think so, too. And so when you argued a minute ago that Mr. Dietrich was in the best position to know about his childhood history, certainly that doesn't include his prenatal history, is a problem, it seems to me. And the other part of your statement had to do with the extent to which Mr. Dietrich's mother was forthcoming. And my read of that input from her was that she was very critical of the stepmother. But I don't know that she was very forthcoming about the extent to which she ingested alcohol during the pregnancy. But I'm ready to listen. If I've missed something, I want to know. Well, I think what's also important to note is that Mr. Dietrich was 30 at the time of this crime. And without a history of violence that undercuts really a claim that he was incapable of, that he had neurological damage that so affected him that he wasn't really responsible for his actions or that there was something that we should consider so compelling that it would warrant leniency in this case. And I think that completely undermines this theory that there was this compelling neurological damage. He made it all the way through to age 30 with no violent criminal, without having committed any violent crimes against someone. Sure, but my problem is I just went to law school. And I don't know what somebody who does what Dr. Dietrich does for a living, or forgive me, what Dr. Briggs does for a living would do with that information. How would he explain this 30-year history without a significant violent crime? That's my problem. Well, I guess all we can do is rely on our common sense. If there is some neurological damage, presumably that resulted from the pregnancy, that that would have surfaced sometime at some point prior to age 30. And when you have the results of the neurological exam that show a high average IQ and no other neurological impairments, it seems to me that the most logical conclusion is what was reached, I think, by the trial court, and certainly by Dr. Briggs, that it was probably the result of alcohol and drug use is what contributed to the crime. And he found that to be a mitigating factor in this case. That's a more logical conclusion than neurological damage that has somehow recovered after the crime. And I think other than the prenatal, the information relating to before he was born, I think all of the other information in terms of the childhood and certainly his behavior up until the time of the crime, I think was essentially cumulative to what was before the trial court. And I don't think that one bit of information is enough to warrant a finding that the trial court should have reached a different conclusion. Thank you. You know, there's a bit of a catch-22 here, and I'm not sure how to resolve it with the case in its current posture. One of your arguments, and one where in your position I probably would make precisely the same argument, is that, well, he was up to 30 years old, and we see no history of violent behavior, so why don't we see that if these psychological assessments are right? Well, there's another explanation for that, of course, and that goes to what's at issue in the Martinez remand. There's at least some testimony at the trial, not believed, but there's at least some testimony at the trial that Charlton was laying it off on him and Charlton was the killer. It's possible, of course, well, it's not open to us at this point to figure this out, that he's not the killer. That would be the purpose of the Martinez remand, to see if there's some possible basis for doing habeas as to the guilt phase. That's what the subject of the order was, by the way. Would you be prepared to discuss that? Yes, I would. And again, I apologize. My only response would be that, at this point, would be that it would need to be a significant claim that we would like to brief before anything was sent back, that this Court can find that it's not a significant claim without first remanding, and this Court has done so in other cases. But you filed a response to the motion, didn't you? To the Martinez motion? The motion to remand. Yes, I believe we did. How old is that? It was about an inch and a half sick. Yes. Did you read that? I did. I just didn't in preparation for this. I apologize. I think I can answer specific questions relating to it. Again, I do apologize. You said you have authority. I'm curious because this seems to be now in a different posture because of the Martinez motion. And so what's your best argument as to why there shouldn't be some sort of a remand to the District Court? What if the claims are not? Are they any substantial or significant? Off the top of my head, I apologize. I can't think of any that are truly significant that go to the guilt phase, but I'd have to go through claim by claim. And again, I apologize for that. I had a question about the billing records, and maybe you know this, but do you know were Mr. Higgins' billing records ever presented to the state post-conviction court? My recollection is that they were only presented to the District Court in the federal habeas proceeding. And so we would be precluded under pinholster to look at those? Yes, I think pinholster limits us to a review of the record that was before the court. And I think the most important- Unless you get a Martinez claim. Right. But Martinez does not apply to ineffective assistance in appealing from the denial of relief from state post-conviction. I think Martinez is fairly limited. But Martinez does go to what was put into the record in the post-conviction court in state court. As to claims of ineffective assistance of trial counsel, yes. If there was ineffective presentation by the trial counsel, and therefore preclusion under state preclusion rules, so you got a state court default, you didn't put it in and so on, if there's a successful Martinez motion, that's, I think then, not only can you raise the claim in federal court, because the ineffectiveness was that it wasn't presented, there's got to be some mechanism for allowing that claim to be presented. Correct? If the claim is a significant claim, yes. Sure. I guess the only other point I'd like to make regarding Dr. Briggs' report, it seems to me accepting the panel's decision on that issue would mean that a trial judge is necessarily required to find that an inmate is, or that a defendant should not be sentenced to death based on that report. And I think if we were to have a trial today, and the defendant were to have a report like that submitted by Dr. Briggs, there would be no requirement that the trial court or the jury find that that warranted leniency. And there would be no real remedy on appeal from that ruling. If the jurors or the trial judge imposing sentence said, I don't find that report to be that compelling, I'm going to find it to be a mitigating circumstance, but I'm going to sentence the defendant to death. There clearly is no remedy on appeal for that type of ruling. And I think under the logic that the panel employed, I think they're suggesting that that was the only conclusion that anyone who looked at that report could reach, that this was necessarily so compelling that Dietrich would not have been sentenced to death by any reasonable fact finder. And I think that's simply incorrect, as found by, again, the judge who sentenced him, and the district court, Judge McEwen, and the Arizona Supreme Court. And if this court doesn't have any further questions, that's all I have. Thank you. You have about four minutes for a button. Let's make it an even four minutes. Counsel for Respondents claimed the evidence was cumulative in state and federal court to what was presented at sentencing. It was not. In federal court, it was discovered that Mr. Dietrich suffers from three mental disorders that are AXIS-1 DSM mental disorders. The evidence also demonstrated he suffered from sexual abuse, which the sentencer never knew about. He also has neuropsychological disabilities consistent with alcohol-related neurodevelopmental disorder, which is a disorder caused by maternal consumption of alcohol in utero. There also was a causal connection that was established in federal court. Quite clearly, Dr. Patino found that Mr. Dietrich's combined disabilities and the trauma that he suffered affected his ability to control his actions the night of the crime. This was not presented at sentencing. Although we know from the Supreme Court case of Wiggins that no causal connection is required, it was demonstrated here. Mr. Dietrich has severe neuropsychological disabilities. He tested in federal court on the neuropsychological testing significantly better than he would have been performing at the neuropsychological testing in 2000 or at the time of the crime. What do you make of the fact that the sentencing judge himself said it wouldn't have made any difference? Well, this sentencing judge is the same sentencer who denied all funding to allow him to understand what this evidence actually was. He decided in advance what was important before knowing what the information was. And that's actually evidenced not only by his second order, the final order dismissing the Strickland claim, but also his earlier order where he says that all of the significant information was presented to him at sentencing and he didn't need to hear anything else. But he didn't know what was significant because he didn't know what that information was because he had prevented the investigation to support those claims. I know you're saying unpleasant things about the judge, but so what? Tell us, what does that do for you? Well, the standard is whether a reasonable fact finder would have found a reasonable probability that the outcome would be different. And we submit here that the evidence is quite clear in federal court that there is a reasonable probability that a reasonable fact finder would have found differently at sentencing. Didn't the post-conviction court, as opposing counsels say, find or credit the child abuse and the mental abuse or mental status of Mr. Dietrich? So what more would he have done? Well, had he known about the sexual abuse, for example, that Mr. Dietrich suffered, there's a reasonable probability it would have changed his mind. He did not know that because he prevented the investigation that could have discovered that. He also found there was no causal connection. Prevented the investigation? He didn't let people go out and investigate? He refused to fund the investigation, which was the only manner. That's quite different from preventing the investigation. Well, in Arizona, there's a statute which allows petitioners to access to the funds. It does not prevent the counsel from sending an investigator going out himself and finding this evidence. Well, they've had to find some funding for it, but there's nothing that prevented him from doing that. And habeas counsel do that on a regular basis. Well, counsel needed an investigator, as he explained in his motion, because he wanted to avoid becoming a witness himself in the case. He could not go and investigate himself because he wanted the investigator to be able to write a mitigation report and testify. Well, I prevented him from hiring an investigator, paying him out of his own funds or getting funding somewhere else and doing an investigation. That's true. All the court did is say, I'm not going to pay for it. He could have been required to pay it out of pocket, but that's not the standard in Arizona. That was not the standard under the ABA guidelines. The standard was to have an investigator. You said prevented the investigation. There's certainly not an accurate statement. He did not prevent the investigation. He simply didn't fund it. There's lots of things that people don't fund that don't prevent from happening, right? Well, our position is that he functionally prevented it because counsel could not afford to hire his own investigator and should not reasonably be expected to do that. What the trial court also did was prevent factual development by denying an evidentiary hearing. And that is something counsel could not have paid for. That was the court's entirely upon the court to allow, and the court refused to hear. I'm sorry. He had evidence that the trial court said, I will not hear the evidence? Yes. The trial court completely denied an evidentiary hearing on the substantive Strickland claim. There was no evidentiary hearing in the state court on the Strickland claim. I'm sorry. I don't think you have my question. Did counsel have evidence to present? Counsel did have evidence to present. Counsel had evidence that the family would testify about the horrific abuse that Mr. Dietrich suffered throughout his childhood. Counsel explained that investigation would reveal further evidence. He also explained this. He said he took it as given, not necessary to have an investigation hearing, because he accepted that. The trial court? Yes. Well, the trial court said that the abuse would not have any further information about abuse, would have been merely cumulative. But the court didn't know what that information was, because, of course, there was no investigation to be done. The counsel also explained that an investigator would testify and would create a mitigation report, and that at the hearing Dr. Briggs would be able to explain his report and demonstrate that there was a causal connection between the crime and Mr. Dietrich's childhood abuse and neurological damage. And that was not about the current testing results. It was about the time of the crime. The attorney general at the state post-conviction proceedings argued stokely, as it was mentioned, they actually argued that this was not mitigating, that it was not untitled to any weight that Mr. Dietrich had suffered childhood abuse and had neurological damage based on this unconstitutional causal connection restriction. Okay. Thank you. Thank you for coming. Thank you. We'll stand for a minute. We'll adjourn.
judges: Kozinski, Pregerson, Reinhardt, Graber, Fletcher, Gould, Bea, Murguia, Christen, Nguyen, Watford